UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


United States of America

       v.                                         2:87-mj-57-jmc-01

David Alcalay


**<u>OPINION AND ORDER</u>**
(Doc. 9)

      David Alcalay, with benefit of counsel, has petitioned for a writ of error *coram nobis*, seeking to vacate his 1987 misdemeanor conviction that resulted from his plea of guilty to the crime of alien smuggling in violation of 8 U.S.C. § 1324(a)(2)(A). (Doc. 9; *see* Doc. 7.)  Alcalay contends he received ineffective assistance of counsel prior to pleading guilty, thereby rendering his guilty plea involuntary and constitutionally infirm.  (Doc. 9 at 9; *see* Docs. 16, 23, 25.)  The government opposes the Petition, asserting that it was filed over 30 years after Alcalay's conviction without providing a reason for the delay, and that, in any event, there are no grounds supporting application of the extraordinary remedy of *coram nobis* relief. (Doc. 15; *see* Doc. 24.)  The authority for the undersigned magistrate judge to hear and decide this Petition is found at 28 U.S.C. § 636(a)(5) as this matter involves a challenge to a conviction for a Class A misdemeanor in which the defendant had consented to magistrate judge jurisdiction.

For the reasons discussed below, I find that Alcalay has unjustifiably filed his Petition too late, and has failed to demonstrate any circumstances so compelling that justice requires *coram nobis* relief. Therefore, Alcalay's Petition for Writ of Error *Coram Nobis* (Doc. 9) is DENIED.

## Background Facts and Procedure

The records of this Court reveal that on October 5, 1987, Alcalay appeared before United States Magistrate[1] Jerome J. Niedermeier, having been charged with the misdemeanor crime of bringing or attempting to bring an alien into the United States, in violation of 8 U.S.C. § 1324(a)(2)(A). (Doc. 6.) Alcalay was represented by Attorney John Brockway. (*Id.*) At the initial appearance, a probable cause hearing was scheduled for October 22, 1987, and Alcalay was released on his own personal recognizance. (*Id.* at 2.) Attorney Brockway later waived the probable cause hearing on behalf of Alcalay. (*Id.*)

On November 2, 1987, Alcalay appeared with his codefendant, Moritz Gang, before Magistrate Niedermeier, and pleaded guilty to the charged offense of violating 8 U.S.C. § 1324(a)(2)(A). (Docs. 7, 14; *see* Doc. 6 at 2.) Attorney Brockway represented both Alcalay and Gang. In response to detailed questioning by the Magistrate, Alcalay testified as follows: he was 40 years old and had finished university; he was satisfied with his attorney's representation of him; the plea

---

[1] The title "magistrate" was later changed to "magistrate judge." *See* 28 U.S.C. § 631, explanatory note titled "Change of name of United States magistrates" ("After the enactment of th[e] [Judicial Improvements Act of 1990], each United States magistrate . . . shall be known as a United States magistrate judge." (quoting Act Dec. 1, 1990, Pub. L. No. 101-650, Title III, § 321, 104 Stat. 5117)).

agreement was a complete representation of his agreement with the government; he had not been forced to plead guilty; he agreed with the factual summary of the offense conduct; and he affirmed that he pleaded guilty to the charge of misdemeanor alien smuggling. (Doc. 14 at 3–27.) Magistrate Niedermeier also engaged in a detailed colloquy with Alcalay concerning the inherent conflict of interest arising from Attorney Brockway's joint representation of both him and Gang, and ascertained that each defendant understood that conflict and wished to proceed with Brockway as their attorney, waiving their right to separate counsel. (*Id*. at 9–12.) *See* Fed. R. Crim. P. 44(c).

At the conclusion of the plea hearing, Alcalay was sentenced to a $3,000 fine plus a $25 mandatory special assessment, the total of which he immediately paid by check. (Doc. 14 at 37; *see* Doc. 6 at 2; Doc. 7.) No term of imprisonment was imposed. (*Id*.) No direct appeal was pursued.

Now, over 31 years after his guilty plea, Alcalay has filed a Petition for Writ of Error *Coram Nobis* through new counsel, seeking to vacate his conviction and sentence. (Doc. 9.) As noted above, Alcalay contends that he received ineffective assistance of counsel from Attorney Brockway, resulting in Alcalay entering an involuntary plea of guilty. Specifically, Alcalay asserts that, prior to his plea of guilty, counsel failed to explain to him the "nature and circumstances and elements of the charged conduct" (*id*. at 7), and "informed [him] that he had no choice at all other than to accept" the plea deal (*id*. at 7–8). Alcalay also claims that counsel failed to interview his brother, who purportedly would have provided exculpatory

evidence concerning Alcalay's knowledge of the undocumented status of the person he brought into the United States. (Doc. 9-3 at 3.) Alcalay further argues that counsel failed to discuss or contemplate filing a motion to suppress "all evidence flowing from a potential illegal stop, search[,] and seizure." (Doc. 9 at 7.) Alcalay contends that Attorney Brockway "never explained the consequences of pleading guilty, of having the conviction remain on [his] record following the entry of his plea of guilty, or how it could affect him in the future." (*Id.* at 8.) Rather, Alcalay states that Brockway simply advised him that if he paid the required fine, "everything would be dismissed." (*Id.*; *see* Doc. 16-1 at 3–8.) Finally, Alcalay contends that Brockway failed to counsel him on the inherent conflict of interest arising from Brockway's joint representation of Alcalay and Gang and failed to secure from them a written waiver of that conflict. (Doc. 16-1 at 3.)

Alcalay argues that he has suffered and continues to suffer compelling collateral consequences from the conviction that resulted from his counsel's alleged ineffective assistance. (Doc. 9 at 6–7, 9–10; *see* Doc. 16-1 at 2.) These consequences consist of: (1) "negative impacts on [Alcalay's] ability to obtain necessary bonding for his businesses [and] . . . necessary bank loans and financing" (Doc. 9 at 10); (2) an inability to have expunged from his record a previously filed and subsequently dismissed state criminal charge in his home state of Florida (*id.* at 6, 10); (3) a "more than potential[] . . . impact [on] his ability to travel internationally" (*id.* at 10); and (4) "myriad other collateral effects" (*id.* at 6). In other words, Alcalay claims his conviction has reduced his ability to transact business and earn money, prevented

him from having a state conviction expunged, and possibly limited his ability to travel internationally. (*Id.* at 6, 9–10; *see* Doc. 16-1 at 2.) According to Alcalay, "[t]hese consequences continue, and are highly likely to continue, to have a significant impact in terms of annual losses and impediments to his livelihood." (Doc. 9 at 10.)

On April 1, 2019, an evidentiary hearing on Alcalay's Petition was held, and Alcalay added the following detail, under oath, to his written claims. (*See* Doc. 22.) Alcalay testified that he was born in Israel and emigrated to the United States in 1975. (*Id.* at 7, 9.) He became a naturalized United States citizen in 1983. (*Id.* at 7.) He earned undergraduate degrees in economics and political science at the Hebrew University in Jerusalem, and has had postgraduate training in banking and financing in Jerusalem. (*Id.* at 8.) As noted above, since earning his degrees and emigrating to the United States, Alcalay has enjoyed success in several business ventures, including the manufacture and distribution of baking flour, aviation sales, and real estate development. (*Id.* at 7–8; *see* Doc. 9 at 6.)

Alcalay testified that his ability to speak and understand English was very limited at the time of his arrest in 1987. (Doc. 22 at 9–10.) He recalled being detained for two days in Derby Line after the arrest, and then being transferred to Burlington, where he appeared in this court for his initial appearance. (*Id.* at 11–12.) Upon his release, Alcalay returned to New York where he consulted with an attorney who then referred him to Attorney Brockway, a Vermont attorney. (*Id.* at 12–14.) Alcalay stated that he "c[ould] hardly remember" his first encounter with

Brockway (*id.* at 14); and that he did not remember going to Brockway's law office, speaking with Brockway on the telephone, or meeting with Brockway anyplace other than in court.[2]  (*Id.* at 14–15.)

Nonetheless, Alcalay testified that after recently reviewing the transcript from the November 1987 plea hearing, he recalled Brockway being with him at the plea proceeding and advising him that he should plead guilty.  (*Id.* at 15–16.) Alcalay also recalled that Brockway never explained the concept of plea bargaining to him, never discussed the facts leading up to the arrest with him, never sent any written materials to him, never explored possible defenses with him, and never explained the elements of the offense to him.  (*Id.* at 16–18.)  Alcalay further testified that Brockway never discussed with him the potential conflicts that are inherent in an attorney's joint representation of codefendants.  (*Id.* at 19.)  According to Alcalay, Brockway advised him that if he entered a plea of guilty, he would be charged a fine of up to $25,000 with no jail time, and then the case "would be over and it would be dismissed and [he would] never hear about it [again]."  (*Id.* at 20.) Alcalay testified that Magistrate Niedermeier similarly advised him that, after he paid the fine, he "[wouldn't] hear from [the Court] anymore."  (*Id.*)

---

[2]  Despite Alcalay's statements at the April 1, 2019 hearing that he could not remember when he first met or spoke with Attorney Brockway (*see* Doc. 22 at 14–15), Alcalay does appear to have spoken with Brockway prior to the 1987 plea hearing, as Brockway testified as follows at that hearing: "When I first met the first of the gentlemen that I represent today, . . . Moritz Gang, . . . the first thing he said to me was, 'I've done a very foolish thing,' and later on David Alcalay confirmed this" (Doc. 14 at 29).

After his 1987 conviction, Alcalay returned to New York and "went back to [living his] life." (*Id.* at 21.) He apparently forgot about the conviction until the year 2013, when he was arrested after being involved in "an incident" in the bathroom at a Florida movie theater. (*Id.* at 22.) Alcalay testified that, although he was initially held on a charge of aggravated battery and spent two days in jail as a result of this incident, he was never formally charged because an investigation by the state prosecuting authorities concluded that there was insufficient evidence to prosecute. (*Id.*; *see* Doc. 21-1 at 3.) Unfortunately for Alcalay, however, his 2013 arrest generated substantial local publicity, both on the internet and in print, including publication of a story along with Alcalay's booking photograph in the Orlando Sun Sentinel, a newspaper of general circulation in Florida. (Doc. 22 at 22–23, 35.) Alcalay testified that he found the publication of this news "disturbing," "inconvenient," and detrimental to his various active business ventures. (*Id.* at 23–24, 35.)

Alcalay testified that publication of the fact of his 2013 arrest "definitely" had a negative effect his ability to "conduct business" and "[secure] loans from financial institution[s]." (*Id.* at 24.) According to Alcalay, following publication of the story of his 2013 arrest, several banks that he conducted business with contacted him to discuss the arrest in the context of their financial/business relationships. (*Id.* at 23, 37.) Alcalay explained that his attorney was required to send letters to these banks explaining the circumstances of the arrest. (*Id.* at 37.) He further explained that he has not been able to extend his lines of credit with the banks; and it is only because

his brother has guaranteed the lines of credit and his family has had a "good relationship" with the banks, that he has been able to maintain his existing lines of credit with them. (*Id.*) Moreover, Alcalay testified that he had attempted to sell his businesses several times and was unsuccessful, surmising that the transactions did not occur "probably because of my background" because "[n]obody wants to do business with [a] criminal like me." (*Id.* at 24–25; *see id.* at 35–36.) More specifically, Alcalay explained that he was in the process of selling his flour business for "about $150 million," but "at the last moment [and] for no reason, . . . the deal was cancel[l]ed" by the purchaser, "presume[ably]" because of the news surrounding his 2013 arrest. (*Id.* at 36.) Alcalay further explained that he was also attempting to sell his aviation business for a price of $190 million, and again, at "the last minute," the purchaser "cancel[l]ed the deal." (*Id.* at 36–37.)

It was at this time, stated Alcalay, that he asked his Florida lawyer if there was a way to "expunge" all records, both in print and on the internet, of his 2013 Florida arrest. (*Id.* at 25.) Responding to Alcalay's lawyer's inquiry, however, the Florida court advised that expungement was not possible due to the "incident in Vermont" in 1987. (*Id.*; *see* Doc. 21-1 at 1.) After his Florida lawyer searched for records of the 1987 Vermont case for about a year, Alcalay retained a Vermont lawyer to assist in obtaining the records, with the apparent aim of procuring some sort of decree of dismissal of the 1987 Vermont case to present to the Florida court to effectuate expungement of the records of the 2013 Florida arrest. (Doc. 22 at 26–28.)

At the April 1 hearing, in response to the Court's inquiry, Alcalay also described his difficulties with international travel due to the 1987 arrest. Preliminarily, Alcalay stated that he has traveled "a lot" and "all around the world" since the 1987 arrest, including one trip to Israel and more than 20 trips to Europe (Switzerland, Germany, England, Ireland, and Spain) to attend aviation conventions and meet with clients in furtherance of his aviation business. (*Id.* at 38–39.) Regarding the "difficult[ies]" that Alcalay encountered with international travel, Alcalay testified that he has ben unable to obtain a "Global Entry" pass, which would allow for expedited border crossings, reduced wait times at airports, no processing lines, and no need to fill out customs paperwork. (*Id.* at 39.) He also recalled an occasion in approximately 2012 or 2013 when he was the subject of a secondary inspection and detained for two hours by immigration authorities in Canada before he was allowed to return to the United States. (*Id.* at 39–40.) Alcalay confirmed that he has never been denied entry into the United States, his country of citizenship, but stated that international travel has been "difficult" and "inconvenient" due to his 1987 Vermont conviction. (*Id.* at 40.) He added that his travel difficulties do not "bother" him as much as his financial problems. (*Id.*)

Attorney Bradley Stetler, a frequent and accomplished practitioner in this Court and an expert in federal criminal practice, filed an Affidavit in support of Alcalay's Petition and testified as an expert witness at the April 1 hearing. (*See* Doc. 9-3; Doc. 22 at 42–60.) Stetler opined that Attorney Brockway's representation of Alcalay with respect to his 1987 conviction was deficient in three ways:

(1) Brockway failed to meet with Alcalay before the plea hearing to instruct him about the elements of the crime charged, particularly the degree of intent required; (2) Brockway failed to explore possible defenses and conduct a proper investigation of the facts underlying the case; and (3) Brockway failed to explain to Alcalay the conflicts inherent in his joint representation of both Alcalay and Gang. (Doc. 9-3 at 2–4; Doc. 22 at 44–57.) In response to an inquiry, counsel for the petitioner informed the court that Attorney Brockway was now deceased.

**Analysis**

## I.  **Legal Standard**

Courts may issue writs of error *coram nobis* pursuant to the All Writs Act, 28 U.S.C. § 1651(a). *See United States v. Morgan*, 346 U.S. 502, 506 (1954). But the writ is an exceptional remedy, to be granted "only where extraordinary circumstances are present." *Nicks v. United States*, 955 F.2d 161, 167 (2d Cir. 1992); *see Doe v. United States*, 915 F.3d 905, 909 (2d Cir. 2019). The remedy is not a substitute for appeal; and relief under the writ is "strictly limited to those cases in which errors . . . of the most fundamental character have rendered the proceeding itself irregular and invalid." *Foont v. United States*, 93 F.3d 76, 78 (2d Cir. 1996) (alteration in original) (internal quotation marks omitted). Issuance of the writ "is essentially a remedy of last resort for petitioners who are no longer in custody pursuant to a criminal conviction and therefore cannot pursue direct review or collateral relief by means of a writ of habeas corpus." *Fleming v. United States*, 146 F.3d 88, 89–90 (2d Cir. 1998); *see Kovacs v. United States*, 744 F.3d 44, 49

(2d Cir. 2014); *Morgan*, 346 U.S. at 511 ("Continuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice.").

In considering whether to issue a writ of error *coram nobis*, the court must presume the proceedings leading to the petitioner's conviction are correct, *Foont*, 93 F.3d at 78–79; "the burden rests on the accused to show otherwise," *Morgan*, 346 U.S. at 512. *See Nicks*, 955 F.2d at 167. The Second Circuit has held that a petitioner seeking *coram nobis* relief "must demonstrate that 1) there are circumstances compelling such [relief] to achieve justice, 2) sound reasons exist [ ] for [the petitioner's] failure to seek appropriate earlier relief, and 3) the petitioner continues to suffer legal consequences from his conviction that may be remedied by granting of the writ." *Foont*, 93 F.3d at 79 (second alteration in original) (internal quotation marks and citations omitted). On appeal, the court reviews de novo the question of whether a district judge applied the proper legal standard, but reviews the judge's ultimate decision to deny the writ for abuse of discretion. *United States v. Mandanici*, 205 F.3d 519, 524 (2d Cir. 2000).

As discussed below, the Court need not reach the merits of Alcalay's ineffective assistance of counsel claims under the first prong of the above test for *coram nobis* relief, because Alcalay has not met the "threshold requirement of asserting sound reasons for h[is] failure to seek appropriate earlier relief" than three decades after his plea and conviction. *Frank v. United States*, 175 F.3d 1007, 1999

WL 88944, at *2 (2d Cir. 1999) (unpublished table decision).  Moreover, Alcalay has not demonstrated that he presently suffers legal consequences from his conviction that may be remedied by granting the writ.

## II.  Alcalay's Delay in Filing

*Coram nobis* relief "has no specific statute of limitations" but "may be barred by the passage of time," *Sahin v. United States*, No. 8:13-cv-358 (GLS/RFT), 2014 WL 2177088, at *2 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted), "in light of the circumstances of the individual case," *Foont*, 93 F.3d at 79.  "Therefore, unless the petitioner can demonstrate sufficient justification for his failure to seek relief at an earlier time, the writ is unavailable and his petition for *coram nobis* should be dismissed."  *Sahin*, 2014 WL 2177088, at *2 (internal quotation marks omitted); *see Foont*, 93 F.3d at 80 ("The critical inquiry . . . is whether the petitioner is able to show justifiable reasons for the delay.").  In deciding the timeliness of a petition, the court considers "whether the petitioner knew or should have known earlier of facts underlying the claim for *coram nobis* relief."  *Nangia v. United States*, No. 11 Civ. 6056(RMB), 2012 WL 4513477, at *3 (S.D.N.Y. Oct. 2, 2012) (internal quotation marks omitted).  The timeliness inquiry "must be determined on a case-by-case basis, with full regard for the attendant circumstances."  *Nicks v. United States*, 835 F. Supp. 151, 153 (S.D.N.Y. 1993).

In cases like this, where there is a "lengthy delay" in seeking *coram nobis* relief, the Second Circuit has held that the court must "determine whether [the petitioner] had 'sound reasons' for [the] . . . delay."  *Nicks*, 955 F.2d at 167; *see Doe*,

2019 WL 623586, at *7.  If the petitioner "does not proffer a sound reason for delay, courts have held that [the petition] should be dismissed if its filing has been delayed for more than several years." *Rodriguez v. United States*, No. 98 Cr. 00764(MHD), 2012 WL 6082477, at *9 (S.D.N.Y. Dec. 4, 2012) (internal quotation marks omitted); *see Cruz v. People of New York*, No. 03 Civ. 9815DC, 2004 WL 1516787, at *4 (S.D.N.Y. July 6, 2004) (collecting cases barring *coram nobis* relief for unjustified filing delays of three, five, and seven years, respectively).  In general, "[t]he sufficiency of the reason[ for the delay] bears an inverse relationship to the length of the delay-the longer the delay, the more compelling must be the reasons." *Tocci v. United States*, 178 F. Supp. 2d 176, 181 (N.D.N.Y. 2001).

Here, Alcalay has failed to demonstrate any sound reason for waiting over three decades to bring his Petition seeking *coram nobis* relief based on ineffective assistance of counsel.  He did not bring a petition for habeas relief under 28 U.S.C. § 2255 on this (or any other) ground,[3] and he does not adequately explain the delay in filing the instant Petition.  Alcalay states that it was not until he was arrested in Florida in 2013, and was thereafter unable to move for expungement of that arrest (given its subsequent prosecutorial declination), that he "became aware of the significant continuing collateral consequences and effects of [his] 1987 plea and

---

[3] In any event, relief under § 2255 likely would have been barred because only a monetary fine was imposed on Alcalay. *See United States v. Boyd*, 407 F. App'x 559, 560 (2d Cir. 2011) ("Restitution orders cannot be challenged through a habeas petition because a 'monetary fine is not a sufficient restraint on liberty to meet the "in custody" requirement,' even if raised in conjunction with a challenge to a sentence of imprisonment." (quoting *Kaminski v. United States*, 339 F.3d 84, 87–88 (2d Cir. 2003))).  Of course, the fact that Alcalay's sentence did not include a term of imprisonment could also constitute some evidence that counsel's representation of Alcalay with respect to his 1987 guilty plea was effective.

conviction." (Doc. 16-1 at 2–3; *see* Doc. 9 at 6–7, 10.) Alcalay explains that he filed his Petition:

> as soon as he actually became aware of the possibility of doing so, and only after a significant period of delay caused by he and his . . . attorneys . . . trying to find and locate a file regarding the underlying case, obtaining the services of a qualified independent reviewing expert, . . . performing necessary research, engaging in pre-filing settlement negotiations with the Government, and only thereafter being required to file his [P]etition.

(Doc. 16 at 2; *see* Doc. 16-1 at 2–3.)

This self-serving and vague statement does not demonstrate sufficient justification for Alcalay's 31-year delay in filing his Petition. Alcalay admitted at the April 1, 2019 hearing that he "knew in 1987 that [he was] guilty of an offense in Vermont."[4] (Doc. 22 at 28–29.) And, despite the apparent confusion back in 1987 over the "intent" element of the offense (*see* Doc. 14 at 16–18, 25–27; Doc. 22 at 46, 62–63), the record of the November 2, 1987 plea hearing reflects that the Magistrate confirmed with Alcalay that, if he decided to go to trial on the offense charged, "the government would have to show that when [he] did th[e allegedly unlawful conduct], [he] acted knowingly, that is not because of some innocent reason, accident[,] or mistake, but [he] knew what [he] w[as] doing" (Doc. 14 at 16–18). The prosecutor then described in detail the factual basis for the offense (*id.* at 18–22), and Alcalay pleaded guilty to that offense (*id.* at 27). Thereafter, Alcalay testified that he was

---

[4] Moreover, Alcalay testified at the November 2, 1987 hearing that he had "fully discussed" the 1987 information charges with his attorney prior to that hearing (Doc. 14 at 4), and that he was "satisfied" with Attorney Brockway's representation of him (*id.* at 9). Also notable, Brockway testified at that hearing that the case against Alcalay and Gang had been "explained to them two or three times" and thus "I think they know what's going on" and "they are very, very remorseful and very sorry that this ever occurred." (*Id.* at 30.)

"sorry" and he "[would] never act [as he had] again." (*Id.* at 31.) The record clearly demonstrates that Alcalay has had the funds for well over a decade to retain an attorney who could have advised him of the potential consequences of pleading guilty to the information in this case, including the possible effect his guilty plea could have if Alcalay was charged with a crime in another state.

Given his inordinate delay in filing the instant Petition, and his failure to provide sounds reason for that delay, I find that *coram nobis* relief is unavailable to Alcalay.

## III.   Legal Consequences from Conviction

I also find that Alcalay has failed to show that he continues to suffer legal consequences from his conviction sufficient to warrant *coram nobis* relief.  The requirement that a petitioner must demonstrate continuing legal consequences from his conviction derives from the Supreme Court's observation that, "[a]lthough the term has been served, the results of the conviction may persist." *Morgan*, 346 U.S. at 512.  As an example, "[s]ubsequent convictions may carry heavier penalties," and thus, the petitioner's "civil rights may be affected." *Id.* at 512–13; *see Sibron v. New York*, 392 U.S. 40, 55 (1968) (acknowledging "the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences").  The Second Circuit has found continuing legal consequences that would support granting *coram nobis* relief where a prior conviction deprives a petitioner of his right to vote under state law, *Kyle v. United States*, 288 F.2d 440, 441 (2d Cir. 1961) (per curiam), and where the conviction serves as an "aggravating factor" in sentencing for a

subsequent offense, *Nicks*, 955 F.2d at 167. On the other hand, the Circuit has held

that the mere "desire to be rid of the stigma" of a conviction is not enough to warrant

*coram nobis* relief. *United States v. Nat'l Plastikwear Fashions, Inc.*, 368 F.2d 845,

846 (2d Cir. 1966) (per curiam); *see also United States v. Osser*, 864 F.2d 1056, 1060

(3d Cir. 1988) ("Damage to reputation is not enough."). Nor is a petitioner's inability

to return to his prior employment, inability to obtain a liquor license, or inability to

take his prior company public, enough to warrant *coram nobis* relief. *See Porcelli v.

United States*, No. CV-00-2500 (CPS), 2001 WL 34894717, at *3 (E.D.N.Y. July 17,

2001), *aff'd*, 303 F.3d 452 (2d Cir. 2002).

A.    **Lost Business Interests**

Alcalay is described in the Petition as an individual who "has built a highly

successful series of businesses . . . located in the State of Florida and elsewhere."

(Doc. 9 at 6.) He has apparently achieved this success in such varied and

sophisticated fields as agriculture, real estate, and the purchase and sale of jet

engines and airplane parts. (*Id.*) At the hearing, Alcalay testified about his baking

flour and aviation businesses, noting that they were valued at $150 million and

$190 million, respectively. (Doc. 22 at 36.) Yet despite these financial successes,

Alcalay claims to suffer business-related encumbrances from his conviction in areas

"relat[ing] to obtaining financing, due diligence compliance issues, bonding

requirements, loan and banking rules, regulations and . . . licensure . . .

requirements, as well as myriad other collateral effects and consequences." (Doc. 9

at 6.) Alcalay provides no more specific explanation of these "myriad other"

consequences in his written filings; nor does he supply any relevant details regarding these business-related consequences.[5] Even at the April 1, 2019 hearing, Alcalay was unable to provide much detail, testifying merely that his "banks and all other business associates [and] partners" called him to find out what happened after they read about his 2013 arrest in the newspaper or on the internet (Doc. 22 at 24); that he encountered problems "conduct[ing] business" and "get[ting] loans" from financial institution[s] (*id.*); and that two purchasers cancelled their involvement in the potential sale of two of Alcalay's businesses, though Alcalay admitted that he "d[id] [not] know exactly" if either cancellation was caused by news of his 2013 arrest (*id.* at 36). Regarding the continuing nature of these consequences, Alcalay imprecisely states in his Petition that they "are highly likely to continue[] to have a significant impact" on his "livelihood" in the form of "annual losses and impediments." (Doc. 9 at 10.)

To meet his burden of demonstrating that he suffers from a continuing legal consequence from his conviction sufficient to warrant *coram nobis* relief, Alcalay must point to "a concrete threat" that his allegedly erroneous conviction's "lingering disabilities will cause serious harm to [him]." *United States v. Craig*, 907 F.2d 653, 658 (7th Cir. 1990). "[I]t is not enough to raise purely speculative harms or harms that occurred completely in the past." *Id.*; *see also Fleming*, 146 F.3d at 91 ("The

_____

[5] Alcalay apparently attempts to clarify or specify these business-related consequences in his Response to the government's Opposition, but his explanation offers little clarity or specification, stating merely that he has "continued to experience significant negative impacts on [his] ability to transact business, obtain necessary bonding for [his] businesses, [and] to obtain necessary bank loans and financing." (Doc. 16-1 at 2.)

requirement of continuing legal consequences would lose all force if speculative harms . . . were sufficient to state a claim for *coram nobis* relief."). Alcalay has not presented the Court with any tangible current threats related to his business endeavors. Moreover, Alcalay points to no law, and the Court is aware of none, stating that lost business profits or other pecuniary interests is a sufficient consequence to support a claim for *coram nobis* relief. To the contrary, the Second Circuit appears to reject such claims, denying for example a petitioner's claim that he suffered from a continuing legal consequence of his conviction because he was unable to find a job. *See United States v. Liffiton*, 159 F.3d 1349, 1998 WL 514031, at *1 (2d Cir. 1998) (unpublished table decision). Similarly, the Seventh Circuit has declined to grant *coram nobis* relief based on an attorney's disbarment and a group of legislators' removal from their pension plan. *Craig*, 907 F.2d at 658–60; *see United States v. Bush*, 888 F.2d 1145, 1149 (7th Cir. 1989) (rejecting *coram nobis* petitioner's reputation injury and difficulty in obtaining employment as satisfactory continuing legal disabilities); *United States v. Keane*, 852 F.2d 199, 204 (7th Cir. 1988) (declining to adopt view that "anyone may obtain *coram nobis* just to bask in the satisfaction of having his position vindicated," and holding that "a blot on one's escutcheon, divorced from any particular entitlement to a 'clean record,' does not . . . involve a liberty interest"). A district court explained:

> *[We have] repeatedly declined to grant coram nobis relief based on post-conviction economic grievances*, finding that consequences such as a fine or difficulty finding employment cannot satisfy the second prong[,] as they do not raise a "concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to the petitioner."

*Cruzado-Laureano v. United States*, Civil No. 09–2303 (JAF), Crim. No. 01–690, 2010 WL 4340987, at *4 (D.P.R. Nov. 2, 2010) (emphasis added) (quoting *Craig*, 907 F.2d at 658–59).

Moreover, the Second Circuit has held that, in order to demonstrate continuing legal consequences based on an inability to obtain employment, a petitioner must show that "he could obtain such employment but for his conviction." *Liffiton*, 1998 WL 514031, at *1 (quoting *Fleming*, 146 F.3d at 90). Analogizing the same principle here, Alcalay would be required to demonstrate that he could obtain the bonding, bank loans, financing, and business sales he claims he would have obtained but for his 1987 conviction. Yet he has not done so. Alternatively, if Alcalay alleges that his business losses stem from less of a pecuniary and more of a reputational harm due to his 1987 conviction, he again fails, as "[r]eputational harm . . . is clearly insufficient to establish continuing legal consequence" sufficient for *coram nobis* relief. *Moskowitz v. United States*, 64 F. Supp. 3d 574, 580 (S.D.N.Y. 2014) (citing *Nat'l Plastikwear Fashions*, 368 F.2d at 846); *see Keane*, 852 F.2d at 204 ("The conviction is a black mark, but that is not a civil disability [warranting *coram nobis* relief].").

## B.    Inability to Obtain Expungement of State Criminal Charge

As discussed above, Alcalay also claims that he suffers the continuing legal consequence of an inability to have his 2013 Florida arrest expunged. (*See* Doc. 9 at 6–7, 10; Doc. 16-1 at 2–3; Doc. 25 at 7.) But Alcalay has provided neither facts nor law to support this argument. In particular, Alcalay has presented no evidence

demonstrating that his 1987 Vermont conviction has prevented expungement of his 2013 Florida arrest record.[6] Nor has Alcalay submitted evidence demonstrating any specific harm that he has suffered as a result of the arrest remaining on his record in the Florida courts.

At the April 1, 2019 hearing, Alcalay testified that, soon after his 2013 arrest, he consulted with Florida counsel about how he could clear his name, and he was advised that "there is a way to expunge . . . [court] records so they won't appear [o]n the Internet." (Doc. 22 at 25.) Alcalay does not provide specific argument or citation to legal sources in support of this claim, but the Court presumes he relies on section 943.059 of the Florida Statutes and Florida Rule of Criminal Procedure 3.692(a)(1), which together "govern[]" "[t]he sealing of a [petitioner's] criminal history." *Grey v. State*, 199 So. 3d 988, 989 (Fla. 4th Dist. Ct. App. 2016). Under Florida law, if a petitioner satisfies the requirements of section 943.059 and Rule 3.692(a)(1), he "is presumptively entitled to an order to seal or expunge court records." *Anderson v. State*, 692 So. 2d 250, 252 (Fla. 3d Dist. Ct. App. 1997). Rule 3.692(a)(1) provides as follows, in relevant part: "A petition seeking to seal or expunge nonjudicial criminal history records must be accompanied by a *certificate of eligibility* issued to the petitioner by the Florida Department of Law Enforcement." Fla. R. Crim. P. 3.692(a)(1) (emphasis added). And the applicable statute similarly states that the court may not order a criminal justice agency to seal a petitioner's criminal history

---

[6] Clearly, the statement in a footnote in Alcalay's Post-Hearing Supplemental Memorandum that "Alcalay testified without contradiction that he has been advised by retained Florida counsel that the Florida matter could not be expunged due to the Vermont conviction," is insufficient. (Doc. 23 at 2 n.2.)

record "until the [petitioner] . . . has applied for and received a *certificate of eligibility for sealing*" from the Florida Department of Law Enforcement (FDLE). Fla. Stat. Ann. § 943.059 (West) (emphasis added). The statute also states that "any request for sealing a criminal history record may be denied at the sole discretion of the court." *Id.* Florida case law provides that a request to seal a criminal history record "may be denied if there is good reason for denial based on the facts and circumstances of the individual case." *Shanks v. State*, 82 So. 3d 1226, 1227 (Fla. 1st Dist. Ct. App. 2012).

The record establishes that Alcalay, through counsel, filed the requisite application for a certificate of eligibility with the FDLE. (*See* Doc. 21-1 at 1.) On May 28, 2014, however, the FDLE sent Alcalay's counsel a letter stating that it "ha[d] not . . . processed" the certificate because it required additional information, namely, a "certified court disposition" regarding Alcalay's 1987 Vermont arrest. (*Id.*) There is no evidence that Alcalay has provided this document to the FDLE; nor is it evident that the FDLE would have again failed to process the application for certificate of eligibility had Alcalay done so. There is also no evidence that Alcalay has moved for expungement or sealing of his 2013 Florida arrest record in a court of competent jurisdiction, despite the applicable statute explicitly stating that the decision to seal a criminal history record is in "the sole discretion of the court." Fla. Stat. Ann. § 943.059.

Furthermore, even if Alcalay succeeded in expunging or sealing his 2013 Florida arrest record, it is unclear how this would remedy the alleged damage done

to his professional reputation and business dealings, given Alcalay's claim that the arrest has already been reported in print and online, and his partners and other business associates or potential associates have already viewed it. (*See, e.g.*, Doc. 22 at 67: Alcalay's counsel stating at April 1, 2019 hearing that the 2013 Florida arrest has "absolutely" been "published all over the place[, including] in the newspaper [and] on the Internet.")  Nothing this Court can do will unring that bell.

### C.    Limitations on Ability to Travel Internationally

Finally, Alcalay suggests that his conviction "more than potentially may impact his ability to travel internationally." (Doc. 9 at 10.)  Setting aside the obviously impermissible speculative nature of this alleged legal consequence from Alcalay's conviction, the Seventh Circuit has explicitly held that "the loss of the right to travel to a foreign country does not appear to be a civil disability of the type justifying the issuance of a writ of error *coram nobis*." *Howard v. United States*, 962 F.2d 651, 655 (7th Cir. 1992); *see United States v. Holt*, Criminal Action No. 2:05-CR-20012, 2017 WL 1181509, at *3 (W.D. La. Mar. 28, 2017), *aff'd*, 697 F. App'x 390 (5th Cir. 2017) (holding that, where petitioner failed to show he was on the no-fly list or would be on the no-fly list had he not been convicted, he "likely does not adequately show a civil disability from the challenged conviction").

Moreover, at the April 1, 2019 hearing, Alcalay testified that he does not in fact claim a loss of international travel opportunities, as he has traveled to Israel once and to Europe over 20 times since his conviction. (Doc. 22 at 38–39.)  The only travel-related issues Alcalay complained of at the hearing were his alleged inability

to obtain a special travel pass, which would expedite his international travel, and an incident when he was subjected to a secondary inspection by immigration authorities in Canada delaying his entry into the United States by two hours. (*Id.*) These allegations are clearly insufficient.

Also noteworthy, the Court is "powerless to redress" any travel restrictions that Alcalay may experience outside the United States, as those restrictions presumably would be imposed by a foreign government. *In re Petitioners Seeking Habeas Corpus Relief in Relation to Prior Detentions at Guantanamo Bay*, 700 F. Supp. 2d 119, 133 (D.D.C. 2010). As one district court explained: "Collateral consequences of prior detention are not redressable if the injuries are 'totally dependent upon the actions of a nonparty sovereign authority beyond the control of this Court.'" *Id.* at 132 (quoting *Al Joudi v. Bush*, Civil Action No. 05-CV-0301 (GK), 2008 WL 821884, at *1 (D.D.C. Mar. 26, 2008)).

## D. Higher Sentence Exposure for a Potential Subsequent Conviction

After the April 1, 2019 hearing, Alcalay has alleged in supplemental briefs that he suffers another continuing legal consequence as a result of the 1987 Vermont conviction: "remain[ing] subject to additional . . . possible criminal sanctions in the future." (Doc. 23 at 3; *see also* Doc. 25 at 7.) Alcalay cites *Fleming v. United States* and *United States v. Nicks* in support of this allegation, but neither of these cases supports Alcalay's claim. In *Fleming*, the court denied *coram nobis* relief to a petitioner who alleged that he suffered the continuing legal consequence of possible disqualification from employment as a securities broker. The court noted that, in

order to satisfy the continuing legal consequence requirement for *coram nobis* relief,
the petitioner "must at least point to a concrete threat that an erroneous conviction's
lingering disabilities will cause serious harm," and "[i]t is not enough to raise purely
speculative harms." *Fleming*, 146 F.3d at 91 (internal quotation marks omitted).
The harms alleged by Alcalay are speculative. In contrast, in *Nicks*, the petitioner's
harm was concrete: Nicks's 1974 federal conviction for armed bank robbery "was
used as an aggravating factor" at his sentencing for his 1983 Alabama state murder
conviction, increasing his sentence to death. *Nicks*, 955 F.2d at 167. There are no
pending charges against Alcalay here, let alone any evidence that he may receive an
enhanced sentence (and certainly not a sentence of death) due to the 1987 federal
conviction.

The mere possibility that Alcalay may be subject to criminal sanctions in the
future as a result of his 1987 conviction is not a sufficient legal consequence to meet
the eligibility requirements of *coram nobis* relief. In *United States v. Foont*, 901
F. Supp. 729, 734 n.2 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 76 (2d Cir. 1996), the Southern
District of New York addressed a similar factual scenario (along with the
defendant's allegation that his conviction prevented him from being able to find a
job), and held as follows:

> Defendant additionally states that his conviction has a negative impact
> on his ability to find work in other fields, and that he faces the danger of
> increased criminal penalties in any possible future proceedings. These
> arguments do not move the Court. I have no doubt that the great
> majority of released felons face difficulty in convincing prospective
> employers to overlook their criminal records when making hiring
> decisions. This is clearly a collateral consequence of a conviction, but it
> is not a *legal consequence* of the type specified by the Second Circuit as a

prerequisite to eligibility for *coram nobis* relief. To call it such would render the continuing legal consequences standard so frequently satisfied as to be toothless.

*Nor can the potential risk of increased future criminal penalties serve as the requisite legal disability.* The Second Circuit relied on this factor in *Nicks* because the defendant was, at the time of his motion, facing the death penalty due to the assessment of his prior conviction as an aggravating factor for sentencing. *Nicks*, 955 F.2d at 162. In this case, however, the threat is purely hypothetical: Foont faces no criminal charges at this time, and therefore no immediate possibility of enlarged criminal penalties for such charges. Potential future harm does not qualify as legal disability.

(second emphasis added); *see Blake v. United States*, Nos. 10 Cr. 349(LAP), 12 Cv. 1843(LAP), 2015 WL 3526964, at *6 (S.D.N.Y. June 4, 2015) (finding petitioner's argument that he suffers a "continuing consequence of conviction" because his conviction "renders him a felon" and thus "disqualif[ies] [him] from many of the privileges enjoyed by members of our society," insufficient to support a writ of *coram nobis*). Likewise here, Alcalay's allegation that his 1987 conviction may result in a higher sentence in a subsequent conviction is purely hypothetical and thus insufficient to qualify as a legal consequence justifying the extraordinary remedy of *coram nobis* relief.

## Conclusion

For these reasons, I find that Alcalay has neither met the threshold requirement of asserting sound reasons for his significant delay in seeking *coram nobis* relief, nor demonstrated that he suffers legal consequences from his conviction that may be remedied by granting a writ of *coram nobis*. Therefore, Alcalay's Petition for Writ of Error *Coram Nobis* (Doc. 9) is DENIED.

Dated at Burlington, in the District of Vermont, this 12th day of June 2019.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge